**IN THE**

**UNITED STATES COURT OF APPEALS**

**FOR THE ELEVENTH CIRCUIT**

_____

**NO. 24-11785-J**

_____

**CARLA JACKSON,**

**Appellant,**

**versus**

**UNITED STATES OF AMERICA,**

**Appellee.**

_____

**A DIRECT APPEAL OF A CRIMINAL CASE
FROM THE UNITED STATES DISTRICT COURT FOR
THE NORTHERN DISTRICT OF GEORGIA, ATLANTA
DIVISION**

_____

**BRIEF OF APPELLANT**

David D. Marshall
Georgia State Bar Number: 471517
2550 Sandy Plains Road
Suite 225 PMB 340
Marietta, Georgia 30066
(404) 213-1358 phone
david.marshall@esquireguy.com

Attorney for Carla Jackson

i

No. 24-11785-J
Carla Jackson v. United States

---

## **CERTIFICATE OF INTERESTED PERSONS**

Pursuant to 11th Cir. R. 26.1-2(a), counsel certifies that the following have an interest in the outcome of this appeal:

Alper, Benjamin, Darrell Thomas' Defense Counsel

Aniekwu, Bobby-Thompson, Benoit's Defense Counsel

Ashong, Dawn, Co-Defendant

Baptiste, Jerry, Co-Defendant

Barnett, Norman, Assistant United States Attorney

Barron, Lynsey, Ashong's Defense Counsel

Baverman, Honorable Alan J., former United States Magistrate Judge (retired)

Belgrave, David II, Co-Defendant

Benoit, Bern, Co-Defendant

Berne, Steven, Dixon's Defense Counsel

Bice, Crystal, Meghan Thomas' Defense Counsel

Blakely, Jesika, Co-Defendant

Boulee, J.P., United States District Judge

Buchanan, Ryan K., United States Attorney

Burby, Raymond, Whittley's Defense Counsel

Chaiken, David, McDuffie's Defense Counsel

Chaiken, Tal, Assistant United States Attorney

Christian, Amanda, Co-Defendant

Cognac, Paul, John Gaines' Defense Counsel

Cross River Bank, Victim

Dixon, Ricky, Co-Defendant

Dodge, Matthew, Federal Defender Office

Durrett, Saraliene, Foster's Defense Counsel

Egbase, Anthony, Benoit's Defense Counsel

Erskine, Kurt R., former United States Attorney

Fallgatter, Curtis, Ashong's Defense Counsel

Foster, Teldrin, Co-Defendant

Gaines, Andre Lee, Co-Defendant

Gaines, John, Co-Defendant

Ghali, Kamal, Parker's Defense Counsel

Gilfillan, Douglas, Baptiste's Defense Counsel

Gram, Brooke Walker, New Horizon Real Estate, LLC Defense

Counsel

Green, Khalil Gibran Sr., Co-Defendant

Hill, Charles, Co-Defendant

Ivory, Victoria, Blakely Defense Counsel

Jackson, Carla, Defendant/Appellant

Kaushal, Samir, Assistant United States Attorney

Kitchens, Nathan, Assistant United States Attorney

Kuritz, Richard, Ashong's Defense Counsel

Marshall, David D., Attorney for Defendant/Appellant

McDuffie, Rick, Co-Defendant

Mendelsohn, Brian, Andre Gaines' Defense Counsel

Michaels, Sandra, Meghan Thomas' Defense Counsel

Moore, Babasijibomi, Assistant United States Attorney

Moore, Siji, Assistant United States Attorney

Nations, Radka, Assistant United States Attorney

O'Brien, Dennis, Petty's Defense Counsel

Paige, Emma, Belgrave's Defense Counsel

Pak, Byung J., former United States Attorney

Parker, Derek, Co-Defendant

Petty, Charles, Co-Defendant

Richardson, Max, Dixon's Defense Counsel

Salinas, Catherine, United States Magistrate Judge

Sall, El Hadj, Co-Defendant

Saul, Michael, Blakely Defense Counsel

Secret, Akil, Hill's Defense Counsel

Sheppard, Kenneth, Petty's Defense Counsel

Shrivastava, Aditya, Baptiste's Defense Counsel

Silas, V. Natasha, Blakely Defense Counsel

Small Business Administration, Victim

Sneed, Sekret, Assistant United States Attorney

Sommerfeld, Larry, Assistant United States Attorney

Spencer, R. Gary, Meghan Thomas' Defense Counsel

Strickler, Margaret, Green's Defense Counsel

Strongwater, Jay, Sall's Defense Counsel

Tapson Macon, Lauren, Assistant United States Attorney

Tate, Samuel Lester, Belgrave's Defense Counsel

Thomas, Darrell, Co-Defendant

Thomas, Meghan, Co-Defendant

Thompson, Teri, Foster's Defense Counsel

Timberlake-Wiley, Deana, John Gaines' Defense Counsel

United States of America, Appellee

Webster, Leigh Ann, Foster's Defense Counsel

Weintraub, Howard, Darrell Thomas' Defense Counsel

Whittley, Ryan, Co-Defendant

Wooldridge, Thomas, Baptiste's Defense Counsel

Wright, Derek, Ashong's Defense Counsel

Yokan, Michael, Sall's Defense Counsel

Zink, Robert, Assistant United States Attorney

No publicly traded company or corporation has an interest in the outcome of this case or of this appeal.[1]

---

[1] New Horizon Real Estate, LLC, ("New Horizon") filed a petition to contest a forfeiture in this case. [See Doc. 967]. On information and belief, New Horizon is not a publicly traded company or corporation.

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

Appellant is not requesting oral argument.

# TABLE OF CONTENTS

CERTIFICATE OF INTERESTED PERSONS ............................. ii

STATEMENT REGARDING ORAL ARGUMENT ................... vii

TABLE OF CONTENTS ........................................................ viii

TABLE OF AUTHORITIES ........................................................ ix

STATEMENT OF JURISDICTION .............................................. vii

STATEMENT OF THE ISSUES ................................................... 1

STATEMENT OF THE CASE ..................................................... 2

     (i)      Course of Proceedings ..................................... 2

     (ii)     Statement of Facts ............................................ 3

     (iii)    Standards of Review ....................................... 30

SUMMARY OF THE ARGUMENT ........................................ …31

ARGUMENT AND AUTHORITY ............................................... 33

   1.  The trial court erred in denying Appellant's motion for acquittal ………………………………………………..33

   2.  The trial court erred in admitting evidence of money transfers to Road Runner Automotive Group, LLC …37

   3.  The trial court committed reversible error in charging the jury on deliberate ignorance ……………………………39

CONCLUSION …………………………………………………..41

CERTIFICATE OF COMPLIANCE ………………………………43

CERTIFICATE OF SERVICE …………………………………...44

# TABLE OF AUTHORITIES

CASES

*City of Prichard, Bonner v.,* 661 F.2d 1206 (11th Cir. 1981)

*Culver, United States v.,* 822 F. App'x 976 (11th Cir. 2020)…………..33

*Hankerson, United States v.,* 2023 U.S. App. LEXIS 29730 (11th Cir. 2023) ....................................................................................................40

*McRae, United States v.,* 593 F.2d 700 (5th Cir. 1979) ........................….9

*Patrick, United States v.,* 513 F. App'x 882 (11th Cir.2013)……………38

*Rivera, United States v.,* 944 F.2d 1563 (11th Cir. 1991)……………….40

*Stone, United States v.,* 9 F.3d 934 (11th Cir.1993)…………………......40

*Steed, United States v.,* 548 F.3d 961 (11th Cir. 2008)…………………..40

*United States, Old Chief v.,* 519 U.S. 172 (1997)…………………………38

FEDERAL STATUTES

18 U.S.C. § 3742 .....................................................................................xi

28 U.S.C. § 1291 .....................................................................................xi

FEDERAL RULES OF APPELLATE PROCEDURE

Fed. R. App. P. 3......................................................................................xi

Fed. R. App. P. 4......................................................................................xi

Fed. R. App. P. 32(a)(5) ..........................................................................43

Fed. R. App. P. 32(a)(6) ..........................................................................43

Fed. R. App. P. 32(a)(7)(B) .....................................................................43

Fed. R. App. P. 32(a)(7)(B)(iii) ...............................................................43

FEDERAL RULES OF EVIDENCE

Fed. R. Evid. 401.....................................................................................37

Fed. R. Evid. 402 ................................................................................37

Fed. R. Evid. 403 ................................................................................38

# STATEMENT OF JURISDICTION

The Eleventh Circuit Court of Appeals has jurisdiction to consider this case pursuant to 28 U.S.C. § 1291 and 18 U.S.C. § 3742, which give the courts of appeals jurisdiction over all final decisions and sentences of the district courts of the United States, and Rules 3 and 4 of the Federal Rules of Appellate Procedure. This is a direct appeal of a final decision imposed in a criminal case in the United States District Court for the Northern District of Georgia, Atlanta Division.

## STATEMENT OF THE ISSUES

1.      The district court erred in denying Appellant's motion for acquittal, as there was insufficient evidence to convict Ms. Jackson of concealment money laundering.

2.      The district court committed error in admitting evidence about Road Runner Automotive Group.

3.      The district court committed error in charging the jury on deliberate ignorance.

## STATEMENT OF THE CASE

### i.    Course of Proceedings

Ms. Carla Jackson was originally indicted back on August 4, 2020 and charged with two counts of concealment money laundering under 18 U.S.C. § 1956(a)(1)(B)(i). (Doc. 1 at 31-32). The Government superseded the indictment on July 13, 2021 (Doc. 135 at 65-66), and again on August 10, 2021. (Doc. 290 at 65-67).[2]

On February 5, 2024, Ms. Jackson proceeded to a jury trial. On February 15, 2024, the jury returned guilty verdicts on both money laundering counts against Ms. Jackson. (Doc. 928). [3] Ms. Jackson was sentenced on May 20, 2024 to 36 months in custody. (Doc. 1005 at 2).[4]

---

[2] The original indictment named five co-defendants and included additional charges of bank fraud, wire fraud, and false statements to financial institutions, and conspiracy. The two superseding indictments did not change or add to the two money laundering charges against Ms. Jackson but instead added new codefendants and charges to the case.

[3] Co-defendant Teldrin Foster also proceeded to trial with Ms. Jackson. The jury found Mr. Foster guilty on all his charged counts. (Doc. 929).

[4] The District Court ordered Ms. Jackson to voluntarily surrender on September 16, 2024 to begin serving her sentence. (Doc. 1005 at 2).

Ms. Jackson timely filed a notice of appeal, and this appeal follows. (Doc. 1008).

## ii.    Statement of Facts

### a.  Background to Paycheck Protection Program

This is a PPP loan fraud case.

The Paycheck Protection Program ("PPP") was a loan program enacted in March 2020 under the federal "Coronavirus Aid, Relief, and Economic Security ("CARES") Act." The PPP loan program made funding available to small businesses in the form of forgivable loans for helping businesses handle payroll, mortgage interest, rent and lease payments, and utilities. The CARES Act and its PPP loan program were designed to provide emergency financial assistance to millions of Americans who were suffering the economic effects caused by the COVID-19 pandemic. (PSR ¶¶ 67-68, Doc. 290 at 4). The PPP loan program was administered through the Small Business Administration ("SBA") but funding for the loans was done through participating financial institutions. (PSR ¶ 68, Doc. 290 at 5-6).

3

### b. Streamlined PPP loan application process

The PPP loan process was meant to be streamlined. The lender would apply through lender, which typically would be online because at that time in April of 2020, no one was going anywhere in person because of the pandemic. (Doc. 1036 at 34). The PPP applicant would submit their application and supporting documentation to the lender. The lender would then make the decision to approve the loan, and then the lender would enter information into SBA's electronic system to obtain a guarantee by the SBA for the loan. Once the SBA issued a loan number, the lending bank would then disperse funds to the borrower. (*Id.*).

### c. Supporting Application Documents for PPP loans

As part of the PPP loan application process, supporting documentation had to be provided by the applicant to the lender to show that it had employees that it was paying salaries to as of February 15, 2020, and to provide support for the calculation of the applicant business' average monthly payroll and the maximum loan amount it could qualify for. (Doc. 1036 at 38-39). A business' bank statements and IRS quarterly tax report forms (Form 941) were used

as supporting documentation for the loan application. (Doc. 1036 at 39). And these types of documents were important to the lender because the lender had very minimal underwriting obligations under the PPP loan program; one of them was to review supporting documentation provided by the applicant. (Doc. 1036 at 45-46).

The PPP loan application form asked for several pieces of important information from the applicant. (Doc. 1036 at 41; Gov't Exh. 3104). Information requested included information such as the type of business structure for the business (sole proprietorship, partnership, corporation, etc.), business contact information, information about the loan amount requested (and how calculated by the applicant), the average monthly payroll for the business, the number of employees, and the stated purpose(s) for the loan. The average monthly payroll is an important number because that number is multiplied by a factor of 2.5 to get the maximum loan amount for which the business can qualify for a PPP loan. Another portion of the PPP loan application dealt with the eligibility of the applicant. The applicant for PPP loan must self-certify that it is eligible for the loan under the rules in effect at the time of the loan,

and there are additional questions that can lead to disqualification for the loan. (Doc. 1036 at 45-47).

### d. Lenders relied on PPP applicant certifications

Because of the way the PPP loan program was designed, it was very streamlined and relied heavily on self-certifications by the borrower in the application form, which the lender did not have to independently verify as it would in a normal loan application process. (Doc. 1036 at 47). The purpose of this loan program was to get funds out the door to qualified businesses as quickly as possible. As such, it had to rely extensively on certifications made by the borrower; the lender was permitted to rely on the certifications and not required to independently verify them. (Doc. 1036 at 50). The SBA also had minimal underwriting obligations for this loan program. All the SBA was required to do was review the application to make sure it is complete, that all certifications were obtained, to review the supporting documentation to show that the applicant had employees for whom paid salaries and payroll taxes, and to do a good faith review of the supporting documentation for the average monthly payroll calculation to determine the maximum loan amount. The

6

lender and the SBA relied on the representations made by the PPP loan applicant. (Doc. 1036 at 50).

### e. Overview of offense conduct

Starting around April 2020, lead defendant Darrell Thomas orchestrated a fraudulent PPP loan and money laundering scheme involving at least 14 PPP loans totaling approximately 11.2 million. (PSR, ¶¶ 71-72). The loan applications were submitted between April 21, 2020, August 10, 2020, and contained false representations about each business's number of employees, average monthly payroll, and the purpose of the PPP loan. (*Id.*). The loan applications also included fabricated supporting documentation for the applying business, including fabricated IRS form 941's (employer's Quarterly Federal Tax Return), fabricated bank statements, fabricated payroll spreadsheets, and/or fabricated financial contacts documents. (*Id.*). Darrell Thomas would recruit individuals to go out to find business owners to submit these loans and he worked with other individuals to create fake documents to support loans as they were submitted to the various lenders. (Doc. 1026 at 27).

### f. Gaines Reservation and Travel – PPP loan application

One of the fraudulent PPP loan applications submitted as part of Darrell Thomas' fraud scheme was from the company "Gaines Reservation and Travel" (hereafter referred to as "Gaines Travel"), a company owned by Andre Gaines. (Doc. 1026 at 6-7, Gov't Exhs. 1000-1009). Andre Gaines was one of the named co-defendants in the original indictment.[5]

On or about May 18, 2020, a PPP loan application and supporting documentation were submitted by Gaines Travel to Cross River Bank. (Doc. 1026 at 7, Gov't Exh. 1000).[6] In the application,

---

[5] Andre Gaines entered a guilty plea to a criminal information in case number 1:21-CR-206 in the Northern District of Georgia on June 17, 2021 to a single charge of false statements under 18 U.S.C. § 1001. He was sentenced to five years of probation and the underlying case (1:20-CR-296) was dismissed. (Doc. Nos. 1, 4, 12). Andre Gaines, the owner of Gaines Travel, is a cousin of co-defendant John Gaines.

[6] The Government introduced email exhibits during trial showing communications between several codefendants in this case who helped prepare the fraudulent documents and PPP loan application materials for Gaines Travel. No communications involving Carla Jackson were introduced. (*See* Docs. 1, 135, 290; *see also* Doc. 1026 at 25-48, Gov't Exhs. 1500-1502, 1201, 1206-1207, 1207A-1207C, 1400 (and sub-exhibits), 1408 (and sub-exhibits), 1300 (and sub-exhibits), 1301 (and sub-exhibits), 1302 (and sub-exhibits), 2301 through 2339 (and sub-exhibits).

Gaines Travel represented that it had sixty-nine employees and $322,684 in average monthly payroll, and that the purpose of the loan was for payroll and lease payments. (*Id.*). The primary contact listed for Gaines Travel on the application was "Andre Gaines." The certifications on page 2 of the application were initialed with the initials "AG." (*Id.*).

In support of its PPP loan application, additional documents were transmitted to Cross River Bank by Gaines Travel. These documents included IRS Form 941's for Gaines Travel for each quarter of 2019 and a JP Morgan Chase bank statement for Gaines Travel for the month of February 2020. (Doc. 1026 at 9-12, Gov't Exhs. 1001-1004).[7] The numbers and balances included in these submitted

According to FBI Special Agent Joseph Stite's trial testimony and based on email and IP records received from Google and Comcast, Darrell Thomas was the person who DocuSigned the PPP loan application for Gaines Travel. (Doc. 1026 at 161-164, Gov Exhs. 1009, 1500-1502, 1603).

[7] Based on his investigation, FBI SA Joseph Stites testified that it was Darrell Thomas and John Gaines who worked together to fabricate the February 2020 bank statement for Gaines Travel. (Doc. 1026 at 37). Andre Gaines, the owner of Gaines Travel, never provided Darrell Thomas with any documents or information via email about Gaines

9

documents were all fabricated, as Gaines Travel had no employees and nominal monthly balances in its business bank account during this time period.

In the February 2020 bank statement submitted with its PPP loan application, Gaines Travel's showed a beginning balance of $674,775.42, and an ending balance for the month of $790,576.16. This bank statement also reflected a large payroll withdrawal on February 13 of that year and on February 27. (Doc. 1026 at 13-14, Gov't Exh. 1005). But in bank statements obtained by the Government directly from JPMorgan Chase for Gaines Travel, the company showed a beginning and ending balance of $190 for the month of February 2020 and no indication of payroll payments for that month. (Doc. 1026 at 15, Gov't Exh. 1105).

Other monthly statements obtained from JPMorgan Chase bank for Gaines Travel also showed low account balances and no business activity. Statements obtained for October through December 2019 all showed no transactions or payroll activity for the company. (Doc.

---

Travel, nor were there any email communications between the two. (Doc. 1026 at 36-37).

10

1026 at 18-19, Gov't Exhs. 1101-1103). This absence of business activity continued into 2020 for the company's bank statements for the months of January, February, March, and April. (Doc. 1026 at 19-21. Gov't Exhs. 1104-1107). In Gaines Travel's bank statement for May 2020, however, there was a large deposit on May 19, 2020 in the amount of $806,710 from Cross River Bank ("CRB"), the same amount listed as the loan request amount on the PPP loan application for Gaines Reservation and Travel. (Doc. 1026 at 7, 21-22, Gov't Exhs. 1001, 1108).

### g. Disbursement of funds from Gaines Travel bank account to Bellator Phront Group bank account

After the large deposit into the Gaines Travel bank account on May 19, 2020, the bank account showed several wire transfers or check transactions. On May 24, 2020, there was a check from the Gaines Travel bank account in the amount of $93,785 made out to Bellator Phront Group. (Doc. 1026 at 48-49). This company name is the same as the domain name for Darrell Thomas' email address of darrell.thomas@bellatorphrontgroup.com. (*Id.* at 49). The check said it was for "Roswell Road Warehouse Rent." (*Id.*). Gaines Travel never

provided FBI Agent Joseph Stites with any information showing that the company had any warehouse that it was renting from Darrell Thomas's company. (*Id.*). Records obtained by FBI Agent Stites from the bank account for Bellator Phront Group for the month of May 2020 showed a deposit for the same amount of $93,785. The deposit date was May 29, 2020. The authorized signers on the bank account for this company were Darrell Thomas and Meghan Thomas. Meghan Thomas is Darrell Thomas' wife and another codefendant in this case. (Doc. 1026 at 49-52, Gov't Exhs. 1111, 1130-1134).

On June 5, 2020, Bellator Phront Group initiated a transfer of $71,144.35 from its bank account to a Bank America account for the company Road Runner Automotive Group, LLC (hereafter "Road Runner"). Road Runner opened this Bank of America account on December 30, 2019 and the signer on the account at the time was Carla J. Jackson. An updated signature card was added to the Road Runner bank account on June 17, 2020 for John Stacey Gaines. The Road Runner bank account was opened after Carla Jackson and John

12

Gaines had been separated. (Doc. 1026 at 52-54, Gov't Exhs. 1132, 1150-1151).[8]

### h. Disbursement of funds from Gaines Travel bank account to bank account of Carla Jackson's business, Management Resource Services, Inc.

Two disbursements from Gaines Travel's bank accounts occurred in June 2020 involving Carla Jackson's business bank account for her company, "Management Resource Services, Inc." (hereafter "MRS").[9] One was a check from Gaines Travel, signed by "Andre Gaines," in the amount of $155,252.50 and dated June 8, 2020. (Doc. 1026 at 59-60, Gov't Exh. 1113). The memo line of the check

---

[8] Before this deposit, the June 2020 bank statement for Road Runner showed an opening balance of $25.20. Additional activity for the month of June for this account included a $7,000 withdrawal on June 8th. There were additional transactions in early June for credit card and loan payments, and an additional $9,500 cash withdrawal on June 16th. On June 17th, there was a cash withdrawal of $7,000 from the account and a payment to Geico with the name Carla Jackson. (Doc. 1026 at 56-57, Gov't Exh. 1151). Most of the transactions for this June 2020 statement were associated with the name "John S Gaines" except for two transactions associated with the name "Carla Jackson." Government exhibit 1151 (Road Runner bank statement for June 2020) also shows two nominal trial credits ("TRIALCREDT") for $0.38 and $0.27 associated with "John Gaines" on June 8, 2020. (Gov't Exh. 1151).

[9] Carla Jackson was the only authorized signer on the bank account for MRS. (Doc. 1026 at 65-66, Gov't Exh. 1160).

reads "For consulting fees and daily business management." According to the trial testimony of FBI Agent Joseph Stites, Gaines Travel had never done any business to consult on and he had seen no payments in the bank records for consulting or business management to any other party.[10] (Doc. 1026 at 60). In a separate bank statement from PNC bank for Gaines Travel, there was a large wire transfer on June 22, 2020 in the amount of $179,985.72. (Doc. 1026 at 64-65, Gov't Exhs. 1120-1125). John Gaines was an authorized signer on Gaines Travel's PNC bank account as of June 6, 2020. (Gov't Exh. 1121).

On the wire transfer confirmation, the client was noted as Gaines Travel and Andre Lee Gaines. (Gov't Exh. 1125). The beneficiary of the wire transfer at the bottom of the confirmation was noted as "Management Resource Services." (*Id.*). According to FBI Agent's Stites' trial testimony, the address listed on the wire transfer confirmation was Carla Jackson's address. (Doc. 1026 at 64). In the section titled "Additional Information" for the wire transfer, the

---

[10] This deposit to MRS forms the basis of count forty-six in the second superseding indictment involving Carla Jackson and John Gaines.

14

purpose of the wire transfer was noted as "Payroll services."[11] (Gov't Exh. 1125).

FBI Agent Stites testified during trial that Gaines Travel did not have any payroll at this time. (Doc. 1026 at 65). These two deposits into MRS' bank account came after the date that Gaines Travel's bank account had received the PPP loan proceeds from Cross River Bank.

Testimony and exhibits at trial showed that MRS' bank account had low monthly balances and little activity before the two deposits in June 2020 from Gaines Travel. The January 2020 bank statement showed a beginning balance of $264.39. The February 2028 statement showed no transactions other than the $14 service fee. The same activity was shown for the months of March 2020 and April 2020, with $14 monthly service fees being the only transactions. The May 2020 statement also showed a monthly service fee of $14 but no other transactions. (Doc. 1026 at 66-68, Gov't Exhs. 1161-1165). In June 2020, the MRS Wells Fargo bank account statement showed two deposits, both from Gaines Travel, in the amounts of $155,252.50 and

---

[11] This wire transfer to MRS forms the basis of count forty-seven in the second superseding indictment involving Carla Jackson and John Gaines.

$179,985.72. The first deposit was a check deposit on June 8, 2020 (signed by Andre Gaines) from Gaines Travel's JPMorgan Chase bank account, and the second deposit was a wire transfer from Gaines Travel's PNC Bank account on June 22, 2020. (*See* Doc. 1026 at 68-69, Gov't Exhs. 1166-1167).

The June 2020 bank statement for MRS also showed in-branch withdrawal activity. On June 18, 2020, there was a withdrawal of $9,700 and a separate withdrawal for $30,000. Bank records show that Carla Jackson obtained three separate $10,000 cashier's checks from Wells Fargo. One check was payable to USAA and referencing an auto loan payment on behalf of John Gaines. Receipt of this payment by Mr. Gaines was confirmed through his USAA bank statement. Another of the two cashier's checks was made payable by Carla Jackson to Capital One in this payment also reference an auto loan payment for John Gaines. Receipt of this payment by Mr. Gaines was confirmed through his Capital One statement. The third $10,000 cashier's check from Carla Jackson was made payable to 365 Enterprises, LLC. The two signers on this bank account were John Gaines and Gayle Carey. "365 Enterprises" was a business associated

16

with John Gaines. (*See* Doc. 1026 at 69-76, Gov't Exhs. 1169, 1181, 1191, 1195).

On June 29, 2020, the MRS Wells Fargo bank statement shows a "Legal Order Debit" in the amount of $295,717.61. This was the seizure by the FBI of the remaining balance in the MRS bank account. There was no further spending in this MRS bank account. (Doc. 1026 at 75-76, Gov't Exh. 1166).

### i. Interview of Carla Jackson by FBI on July 7, 2020[12]

As part of this investigation in this case, FBI Special Agent Joseph Stites conducted a "walk and talk: show up interview at the residence of Carla Jackson on the morning of July 7, 2020. Agent Stites was accompanied by fellow FBI Special Agent Chip Cromer. At the time of the agents' arrival at Ms. Jackson's residence, Ms. Jackson was in the middle of an online meeting for her job, which she had to interrupt because of the agents' arrival.

---

[12] *See*  Doc. 1022, Gov't (audio CD) Exh. 1021. The summary set forth above and below is from the audio recording which is 13:07 minutes in length. First contact at the door occurs at about 1:56. Ms. Jackson briefly leaves the agents at the front door to handle a job matter but returns at about 2:56 for the start of the interview.

After Ms. Jackson answered her front door, Agent Stites introduced himself and agent Cromer (Stites did not say they were with the FBI in the audio recording). Agent Stites began asking Ms. Jackson questions about her business, Management Resource Services. He asked what type of business it was, and she replied that it was a consulting services business, for project management and construction. Ms. Jackson told Stites that she had no current employees. Agent Stites turned to questions about money that had recently "hit" her bank account at Wells Fargo. She told him that the money came from Gaines Travel and was for payroll for a potential construction project. She said that if she does a project and hires subcontractors, she pays them.

Agent Stites continued with several questions for Ms. Jackson about the project and her business. She told him that the money came from "Gaines Travel and Reservation" [sic] and that she had spoken with Andre Gaines about the project. Andre Gaines had been referred to Ms. Jackson by a contractor and that Mr. Gaines had contacted her about the project. Andre Gaines contacted her sometime the previous year and again in the early part of 2020. When asked if she knew

18

Andre Gaines, Ms. Jackson responded that she knew of Andre but did not know him personally.

Ms. Jackson told the agents that she needed to return to her business conference and calls and that she could the agents back later. Agent Stites agreed to that but instead of leaving, he followed up with more questions for Ms. Jackson. Stites continued with questions about how the money from Gaines was payroll for a project that had not started yet. Jackson told Stites that she had employees lined up but had not finalized it yet.

When asked if she knew where the source of the funds came from for the bank deposits, she told Agent Stites that she did not know. She also did not know Darrell Thomas, or Meghan Thomas, or a company called Elite Executive Services. When asked why the money came before the project, she told Stites that she and Andre had already discussed it, and she had presented a proposal for the project. She told Stites that she had a copy of the proposal.

At the end of Agent Stites' questions, he presented a Grand Jury subpoena for records from her business. The due date was July 21 (2020). He gave some basic instructions about the subpoena. Agent

19

Stites closed his meeting off by noting that these were large amounts of money going into her account. Ms. Jackson did not respond except to say that she would need to speak with her attorney. She did not give the attorney's name to Agent Stites. The agents then left Ms. Jackson's residence. Agent Stites did not ask any questions about John Gaines to Ms. Jackson during the interview.

### j.  Agent Stites' trial testimony

During FBI agent Stites' cross examination, agent Stites answered several questions about his basic investigative process in this case, and that he had done many interviews, issued subpoenas, and had obtained some search warrants as part of this investigation. (Doc. 1027 at 57-59). WhatsApp messages were obtained from codefendant Darrell Thomas' phone. (*Id*. at 58). Stites acknowledged that they had processed phones and other digital devices (e.g., desktop computers, laptop computers) for this investigation and that information and evidence obtained from them can be very important. (*Id*. at 58-59). Although Stites noted that obtaining cell phone evidence and information from computers, desktop, and laptops, can be very important, he did not do so with Ms. Jackson and never

20

issued subpoenas or requested search warrants for any of her devices. (*Id.* at 59).

Agent Stites answered several questions about his interview with Carla Jackson. Stites testified that he had Ms. Jackson's phone number and could have called her before showing up, but that what is normal procedure just depends on the investigation. (Doc. 1027 at 60-61). Stites believed that the best way to do an interview with Ms. Jackson would be a knock-and-talk interview and to serve her with a subpoena. (*Id.*). Stites acknowledged that just showing up at someone's house unannounced can be surprising and shocking for some individuals. (*Id.* at 61).

Agent Stites testified that he believed that John Gaines likely spent time at Ms. Jackson's residence during the time frame of the investigation, including staying overnight at the residence. (Doc. 1027 at 64-65). When presented with Government's Exhibit 1161 that showed the computer IP addresses for devices that had logged into Wells Fargo, or accessed the site, Agent Stites agreed that the person who had accessed the Wells Fargo site could have been John Gaines

21

and that he did not know who specifically had accessed the site.[13] (*Id.* at 67-68).

Regarding the two bank deposits into Ms. Jackson's MRS business account in June 2020 from Gaines Travel, Agent Stites agreed that he had no evidence of any emails or other communications that involved Ms. Jackson. (Doc. 1027 at 73-74). Stites also had no evidence of communications involving Ms. Jackson about the withdrawals made from the MRS account in June 2020 after the two large deposits from Gaines Travel. (*Id.* at 76-78).

Agent Stites was also asked several questions during trial about the Grand Jury subpoena he served on Ms. Jackson during his interview on July 7, 2020. Stites did not know that the subpoena response he got back from Ms. Jackson was missing pages (pages 2 and 3 of several) and he could not confirm if he sent all pages of the subpoena to her. He also testified that he did not review her subpoena response when he received it. The first time Stites knew there were missing pages to the subpoena was during his trial

---

[13] One of the IP addresses in Gov't Exh. 1116 is associated with Ms. Jackson's home address in Tucker, Georgia.

testimony and cross examination by defense counsel for Carla Jackson. (Doc. 1029 at 109-114).[14] Stites testified that the production requests did not specifically request copies of documents from digital devices or media. (*Id.* at 110-112).

### k.  John Gaines trial testimony.

Co-defendant John Gaines testified at trial as a defense witness for Carla Jackson. He did so while advised by his attorney and while he had a pending sentencing hearing.

During direct examination by counsel for Ms. Jackson, Mr. John Gaines acknowledged that he was once married to Ms. Jackson but that the two had divorced sometime in 2017, 2018, or 2019. (Doc. 1030 at 11). Mr. Gaines said that the reason for the separation and divorce was because he had been unfaithful to Ms. Jackson and had children outside of the marriage with another woman. (*Id.* at 12). Ms. Jackson, according to Mr. Gaines, was very upset about this. (*Id.*).

---

[14] The Government did not introduce this subpoena, but defense counsel refreshed Agent Stite's recollection with the document while he testified. A copy of the Grand Jury subpoena for Ms. Jackson was included as an attachment to its sentencing memorandum for Defendant's sentencing hearing. (Doc. 994, Exh. A).

Mr. Gaines testified that he hid from Ms. Jackson what he was doing with the PPP loan application for Gaines Travel. (Doc. 1030 at 13). He stated that Andre Gaines is his cousin and the owner of Gaines Reservation and Travel. John Gaines is not a co-owner, but he was a cosigner on the company's bank accounts. (*Id.* at 13-14). Ms. Jackson never had access to the bank accounts for Gaines Travel. (*Id.* 14-15). John Gaines stated that he introduced his cousin Andre to Darrell Thomas and the person who processed the PPP loans. (*Id.* at 16).

When asked what he told Andre Gaines about the PPP loan application process, John Gaines stated that he knew that both he and Andre were interested in funding a project in Alabama and in purchasing a building there. (*Id.* at 16). The two both came up with the idea. (*Id.* at 17).

In applying for the PPP loan for Gaines Travel, John Gaines testified that Carla Jackson was not involved at all in submitting or preparing the loan application for the company. (*Id.* at 18-19). And he never had any discussions with Carla Jackson about the fraudulent nature of the PPP loan for Gaines Travel. (*Id.*).

24

John Gaines testified about Carla Jackson's work background. She is a project manager and had worked for IBM for some 20 years, and after leaving IBM she has been a project manager ever since. (Doc. 1030 at 21). She's very good at organization, consulting, management, things of that sort. (*Id.* at 21). At the time of this PPP loan application, Ms. Jackson was working for a company and receiving a regular salary. (*Id.*). When shown the business bank check signed by Andre Gaines to Ms. Jackson's company MRS, John Gaines stated the signature on the check was his cousin's, Andre Gaines. John stated that the memo line in the check that discusses consulting fees for daily business management had to deal with the purchase of a building and the daily management of the construction workers. (*Id.* at 22).

John Gaines answered questions about the cashier's checks he received from Carla Jackson in June 2020. One was for his company 365 Enterprises, and it was for construction work that was ongoing. (Doc. 1030 at 23). Another of the cashier's checks for Capital One was for a payment on an auto loan of his. (*Id.* at 24-25). Mr. Gaines testified that he was the one who wrote in the information on the

25

memo lines of these checks. (*Id.* at 25-26). Mr. Gaines also wrote in the memo line information for the USAA check. (*Id.* at 26). Mr. Gaines also acknowledged that he sent a text message to Carla Jackson instructing her to get cashier's checks for the three companies. (*Id.* at 27-28).

When asked about the two deposits that went to Management Resource Services, Mr. Gaines testified that the purpose of those monies was for the project that they were scheduling to do in Montgomery, Alabama. He had discussed this with his cousin, Andre. John Gaines never told Ms. Jackson anything about the fraudulent source of the funds that went into her account. (Doc. 1030 at 32-33).

John Gaines also testified during trial that he lived at Ms. Jackson's house occasionally and stayed about two days a week there, on and off at the residence. (Doc. 1030 at 48-50). He had a computer at her house, a laptop, and he had access to the internet on the computers. (*Id.*). He does not recall if he accessed the bank accounts when he was over there, but it was something he could do if was at her house during the timeframe of May through June 2020. (*Id.*

26

at 49). He acknowledged having access to the bank account for Gaines Travel and that he had the login information, including the password, and that he could access that bank account from Ms. Jackson's house. (*Id.* at 50-51).

When asked questions about the PPP loan application that Ms. Jackson had filled out but had not submitted, John Gaines stated that he only had discussions with her about legitimate PPP loans. (Doc. 1030 at 105). When shown Government's Exhibit 1228, an email from John to Darrell Thomas that said: "Darrell, nigga this my wife real shit have this shit in order," John testified that this meant to Darrell Thoms that this was "legit," a legitimate PPP loan application. (*Id.* at 105, Gov't Exh. 1228). And Ms. Jackson, according to Mr. Gaines, never filled out any fake forms with incorrect employee numbers or any misrepresentations related to a PPP loan application, and she never submitted any PPP loan application. (*Id.*).

According to John Gaines, Carla Jackson never knew of the real purpose why he and Darrell Thomas were trying to move the funds to Ms. Jackson's business bank account from Gaines Travel. (Doc. 1030 at 112-113). Darrell Thomas told John Gaines that the PPP

27

people were pulling money back, taking money from people, so we decided to move it before they took it back. (*Id.*). John never discussed with Ms. Jackson the reason for moving the money. He stated, "She never asked and I didn't tell." (*Id.*).

### l.  Court's jury instruction on deliberate ignorance

The trial court granted the Government's request for a jury instruction on "deliberate ignorance." Ms. Jackson objected to this instruction being given. The instruction as charged to the jury read as follows (Doc. 1032 at 21-22):[15]

> If a defendant's knowledge of a fact is an essential element of a crime, it's enough that the defendant was aware of a high probability that the fact existed unless the defendant actually believed the fact didn't exist.
>
> Deliberate avoidance of positive knowledge, which is the equivalent of knowledge, occurs, for example, if a defendant possesses a package and believes it contains a controlled substance but deliberately avoids learning that it contains the controlled substance so he or she can deny knowledge of the package's contents.
>
> So you may find the defendant -- that a defendant knew about the possession of a controlled substance if you determine beyond a reasonable doubt that the

---

[15] Defense counsel for Carla Jackson renewed Ms. Jackson's previous objections to this charge after the trial court's completion of the charge to the jury. (Doc. 1032 at 27).

defendant actually knew about the controlled substance or had every reason to know but deliberately closed his or her eyes.

And I would add, with counsel's permission, for example. Hearing no objection.

But I must emphasize that negligence, carelessness or foolishness isn't enough to prove that the defendant knew about the possession of the controlled substance, in that example.

## STANDARDS OF REVIEW

A district court's denial of a motion for judgment of acquittal is subject to *de novo* review, applying the same standard used in reviewing sufficiency of the evidence. In reviewing sufficiency, we view the evidence in the light most favorable to the government and make all reasonable inferences and credibility findings in the government's favor. *United States v. Holt,* 408 F. App'x 229, 235 (11th Cir. 2010).

The Court reviews the admission of evidence for abuse of discretion. *United States v. Harding,* 104 F.4th 1291, (11th Cir. 2024).

We review *de novo* a defendant's claim that the district court erred in instructing the jury on deliberate ignorance. *United States v. Argiz,* 805 F. App'x 953, 955 (11th Cir. 2020).

## SUMMARY OF THE ARGUMENT

The district court erred in denying Appellant's Rule 29 motion for acquittal, both after the Government's case-in-chief, and after the defense presented its case-in-chief. There was no direct evidence or sufficient circumstantial evidence that Ms. Jackson knew that the money involved in the transactions were the proceeds of some kind of illegal activity. Nor did Ms. Jackson know that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership or the control of the proceeds. The Government's evidence was insufficient to support a guilty verdict on both counts charged against Ms. Jackson in the indictment.

The district court erred in admitting evidence about the company Road Runner Automotive Group, LLC as intrinsic evidence. There was no need for the evidence by the Government, as codefendant John Gaines was no longer a part of the case and he did not proceed to trial. The evidence improperly placed Ms. Jackson's character at issue for uncharged conduct. Evidence of money transfers from a company owned by Darrell Thomas (Bellator Phront Group) to Road Runner (a company co-founded by John Gaines and

31

Carla Jackson) was not necessary to complete the story of the Government's case and was more prejudicial to Appellant than probative of one's guilt. Ms. Jackson additionally asserts that the evidence was not relevant to the charges against her and that the prejudicial value of such evidence outweighed its probative value.

The district court erred in charging the jury on deliberate ignorance. This was not a case where the charge was appropriate; the Government's evidence (and Defendant's evidence) did not support it.

## ARGUMENT AND CITATIONS TO AUTHORITY

**I.**    **The district court erred in denying Appellant's motion for acquittal, as there was insufficient evidence to support her convictions for concealment money laundering.**

To prove its case of concealment money laundering against Ms. Jackson, the Government must prove beyond a reasonable doubt *four* elements of the offense that it cannot satisfy. First, that the Defendant knowingly conducted or tried to conduct a financial transaction. Second, that Defendant knew that the money or property involved in the financial transaction were the proceeds of some kind of unlawful activity. Third, that the money or property did come from a specified unlawful activity, specifically wire fraud. And four, the Government must prove, beyond a reasonable doubt, that the transaction was designed, in whole or in part, to conceal or disguise the nature, location, source, ownership, or the control of the proceeds. *See United States v. Culver*, 822 F. App'x 976, 982 (11th Cir. 2020).

In determining whether there was a purpose of concealment, the Court looks to whether there is evidence of:

> [S]tatements by a defendant probative of intent to conceal; unusual secrecy surrounding the

33

> transaction; structuring the transaction in a way to avoid attention; depositing illegal profits in the bank account of a legitimate business; highly irregular features of the transaction; using third parties to conceal the real owner; a series of unusual financial moves cumulating in the transaction; or expert testimony on practices of criminals.

*Culver, supra,* 822 F. App'x at 982.

The Government has not met its proof burden as to the second and fourth elements of concealment money laundering.

To prove the element of concealment, the government must prove that the purpose, not merely the effect, was to conceal or disguise the nature, location, source, ownership or control of the proceeds. Evidence of concealment must be substantial. Merely conducting a transaction with money whose nature has been concealed is not in and of itself a crime.

The Government hinges much of its proof on evidence that Ms. Jackson told FBI Agent Stites during her interview that the purpose of the funds was for "payroll." Ms. Jackson told Agent Stites that she had met with Andre Gaines and discussed a project in Alabama. That statement to Agent Stites has never been rebutted and it was further supported by the testimony from defense witness John Gaines. John

34

Gaines testified that he and his cousin, Andre Gaines, both came up with the idea of doing a project in Alabama. And Ms. Jackson told Agent Stites that she met with Andre to discuss the project. That project is what these funds were for and not for an effort to hide the funds, or to conceal them.

The Government had every opportunity to bring Andre Gaines into court to testify at trial, but it chose not to. Andre Gaines owned Gaines Travel. His signature is on the PPP loan application at issue. He interacted with John Gaines and would know what John had told him about the PPP loan program and what the funds were for. And Carla Jackson told Agent Stites early on, years before trial, that she met with Andre Gains to discuss this project and her proposal for the project. And yet, the Government opted not to rebut any of Ms. Jackson's statements about the project by simply bringing Mr. Andre Gaines to court. The burden of proof is not on the defendant and Ms. Jackson was not obligated to bring witnesses in to prove her innocence.

The Government's case against Ms. Jackson relies on a walk-and-talk interview, a response to an incomplete Grand Jury subpoena

35

form, her association with John Gaines after a divorce, and low monthly bank balances for her business before the two deposits made to her account in June 2020. Whereas the Government had substantial email and other communications from multiple defendants in this case, including Darrell Thomas and John Gaines, it has absolutely no such evidence from Ms. Jackson, not one text message or any emails discussing anything about the underlying fraud or money laundering.

The Government cannot meet its burden for either of the two critical offense elements set forth above. It must meet both, not just one. And it has failed to do so.

The district court's denial of Appellant's motion for acquittal, raised twice at trial, was in error. Ms. Jackson seeks a reversal of both convictions for the two money laundering counts.

**II.    The district court erred in admitting evidence of money transfers to Road Runner Automotive Group, LLC, a company co-owned by Carla Jackson and John Gaines.[16]**

The starting place for evidentiary admissibility is relevance. *United States v. McGregor*, 960 F.3d 1319, 1323, 1324 (11th Cir. 2020). Evidence is "relevant" under Rule 401 of the Federal Rules of Evidence if "it has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is a consequence in determining the action." *Id., citing* Fed. R. Evid. 401. And under Rule 402, "'[r]elevant evidence is admissible' unless provided otherwise by the Constitution, federal statute, the other Federal Rules of Evidence, or other rules made by the Supreme Court." *Id, citing* Fed. R. Evid. 402. *Id.*

In the present case, evidence about the company Roadrunner has no relevance to the charges against Ms. Jackson. The only two codefendants that Roadrunner evidence could have applied to were Darrell Thomas and John Gaines, both of whom entered guilty pleas and who did not proceed to trial.

---

[16] Defendant Jackson objected to the introduction of this evidence in pretrial motions and during trial. (Docs. 897, 904, 1024 at 24-29, 1035 at 138-140, 1026 at 53).

The district court should have prohibited the Government from introducing any evidence about Roadrunner during trial or making any mention that Ms. Jackson was involved with Roadrunner in any way. It is not relevant evidence for Ms. Jackson's charges, or to the Government's case against her.

Even if evidence is found to be relevant, a district court may nonetheless exclude relevant evidence under rule 403 if "its probative value is substantially outweighed by the danger of … unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting the time, or needlessly presenting cumulative to evidence." *United States v. Patrick*, 513 Fed. Appx. 882, 886 (11th Cr. 2013), *citing* Fed. R. Evid. 403.

"The term 'unfair prejudice,' as applied to a criminal defendant, "speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." *Id.*, *citing Old Chief v. United States*, 519 U.S. 172, 180 (1997). "The primary function of Rule 403 is to exclude evidence of 'scant or cumulative probative force, dragged in

38

by the heels for the sake of its prejudicial effect." *Id., citing United States v. McRae,* 593 F.2d 700, 707 (5th Cir. 1979).[17]

In the present case, admission of evidence related to Roadrunner unfairly prejudiced Carla Jackson, as it "lure[d]" the jury into possibly declaring guilt "on a ground different from proof specific" to the two charges against Ms. Jackson in counts 46 and 47. Those two counts, and the underlying evidence introduced at trial by the Government, have nothing to do with Roadrunner, and any evidence related to Roadrunner should have been precluded from admission on both relevance grounds *and* a Rule 403 analysis.

## III. The district court committed reversible error in charging the jury on deliberate ignorance.

"[If] 'the facts support the inference that the defendant was aware of a high probability of the existence of the fact in question and purposely contrived to avoid learning all of the facts in order to have a defense in the event of a subsequent prosecution,' then the

---

[17] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

deliberate ignorance instruction is appropriate." *United States v. Hankerson,* 2023 U.S. App. LEXIS 29730 at 11 (11th Cir. 2023), *citing United States v. Steed,* 548 F.3d 961, 977 (11th Cir. 2008) (per curiam). The standard is the same whether the evidence is direct or circumstantial. On the other hand, district courts err in giving the deliberate ignorance instruction when there is relevant evidence of only actual knowledge rather than deliberate avoidance. *Id.*

Courts should apply the deliberate ignorance instruction "'only in those comparatively rare cases where . . . there are facts that point in the direction of deliberate ignorance.'" *United States v. Rivera,* 944 F.2d 1563, 1570 (11th Cir. 1991). A deliberate ignorance instruction is appropriate only when there is evidence in the record "showing the defendant purposely contrived to avoid learning the truth." *United States v. Stone,* 9 F.3d 934, 937 (11th Cir. 1993).

The district court in this case charged the jury on deliberate ignorance and Appellant asserts this was reversible error.

The Government argued for this jury instruction because it had little direct evidence against Ms. Jackson regarding the two "knowledge" offense elements for concealment money laundering.

40

There were no emails or other communications involving her, as there were for other codefendants. And the Government decided not to call a critical witness, Andre Gains, who had direct knowledge of what he discussed with Ms. Jackson about the PPP loan and the project in Alabama that Ms. Jackson told FBI Agent Stites about and that codefendant John Gaines testified about during trial. Instead, the Government requested this jury instruction to fill in the gaps in its missing evidence. John Gaines testified that Ms. Jackson knew nothing about the illegal source of the PPP loan proceeds and knew nothing about efforts to conceal the monies by moving them to her business bank account. Even if the trial court did not find John Gaines' trial testimony credible, the remaining evidence did not justify the deliberate ignorance charge.

## CONCLUSION

For the reasons articulated above, this Court should vacate Ms. Jackson's convictions because of insufficient evidence, the trial court's reversible error in charging the jury on deliberate ignorance, and in the district courts harmful error in admitting evidence about Road Runner automotive group, LLC. Appellant asks the Court to reverse

Appellant's convictions, or, alternatively, remand for further proceedings.

Dated this 5th day of September, 2024.

Respectfully submitted,

 /s/David D. Marshall
David D. Marshall
Attorney for Appellant
*Georgia Bar No. 471517*

2550 Sandy Plains Road
Suite 225 PMB 340
Marietta, Georgia 30066
(404) 213-1358 (phone)
david.marshall@esqurieguy.com

42

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)

I certify that this brief complies with the type-volume limitations of Fed. R. App. P. 32(a)(7)(B) because this brief contains 7,985 words, (no more than 13,000 words).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Book Antiqua 14.

Dated this 5th day of September, 2024.

Respectfully submitted,

/s/David D. Marshall
David D. Marshall
Attorney for Appellant
*Georgia Bar No. 471517*

2550 Sandy Plains Road
Suite 225 PMB 340
Marietta, Georgia 30066
(404) 213-1358 (phone)
david.marshall@esqurieguy.com

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Brief was filed by uploading it with the Eleventh Circuit's Electronic Filing System which will automatically serve opposing counsel with the Brief.

Dated this 5th day of September, 2024.

Respectfully submitted,

 /s/David D. Marshall
David D. Marshall
Attorney for Appellant
*Georgia Bar No. 471517*

2550 Sandy Plains Road
Suite 225 PMB 340
Marietta, Georgia 30066
(404) 213-1358 (phone)
david.marshall@esqurieguy.com

44